## SINGERY vs. THE ATTORNEY-GENERAL.

APPEAL from a decree of the Court of Chancery. The bill filed in the name of the *Attorney-General*, at the re-

forged, such evidence could have been deemed admissible, only on the ground, that if the certificate was proved to be forged, the grant obtained on it was fraudulent, and could have no operation in law to pass the land to the grantee.

Fraud may be inquired into as well at law as in equity; and where frauds are clearly established, the courts of law and of equity have concurrent jurisdiction.

Where the fact of the forgery of a certificate of survey, under the grant on which the defendant claimed, came before the court and jury collaterally, and was not directly in question, the issue between the parties being, who had the right of possession to the land in controversy, the verdict in favour of the defendant, cannot be received as evidence to prove that the certificate was not forged.

1809

Singery
vs
Attorney-General

lation of *Ezekiel Boreing*, on the 19th of November 1799, stated, that in the year 1770, the surveyor of *Baltimore* county, being directed by the commissioners of the Lord Proprietary to survey and lay out, for any persons that might apply to him, any part of the *Reserve* land in that county, to enable them to contract with the commissioners for the purchase of such land, *James Calder*, as surveyor of the county, by virtue of the power and authority from the commissioners, did, on the 30th of September 1770, survey and lay out for *Singery*, (the appellant,) a tract of land in the *Reserve* called *Singery's Trouting Streams*, containing 178 acres, and included within the courses and distances described in a certificate of the courses, taken from the original entry in the surveyor's books, &c. "Beginning at two bounded white oaks standing between two barren hills, at the end of the last line of a tract called *Merryman's Mountain*, (included,) and about W 9 perches from *George's* Run, and running thence," *(nineteen courses and distances, without calls,)* "and thence with a straight line to the beginning, containing 178 acres, and called *Singery's Trouting Streams*. September 30th 1770." That the certificate made out by *Calder*, as surveyor of the county, for *Singery's Trouting Streams*, to be returned to the land office, corresponded in all respects with the record of the courses kept by the surveyor himself as above described, but that *Singery* combining, &c. how to impose upon and defraud the Proprietary out of his land, and the purchase money which he would otherwise be entitled to, returned to the land office a certificate of the courses of *Singery's Trouting Streams* different from that which was made out by the surveyor, as will more fully appear by the certificate and plot of the land recorded in the land office. That in the true and genuine certificate of *Singery's*

The court not having directed the jury that if they found the certificate forged, that nothing passed by the grant, it may be questioned, whether the verdict could conclude the plaintiff if the fact of forgery had been directly in is ue.

On a bill in chancery for vacating a certificate of survey and grant, on the ground of fraud, committed by a forgery of the certificate—*Held*, that the court of chancery had jurisdiction although the question of forgery of the same certificate had, in an action of ejectment between the same parties come collaterally before a court of law and jury, and although that court admitted evidence to establish the forgery, and the jury gave their verdict in favour of the defendant, who claimed under the certificate alleged to be forged.

Although on a bill in chancery charging forgery, the defendant cannot be compelled to answer any fact which will criminate himself, yet that court has jurisdiction over the case; and on proof of the forgery, by which a fraud has been committed, will grant relief by vacating the grant, &c. from whence the injury has arisen, or will make such decree as the circumstances of the case render necessa y.

The forgery of a certificate of survey, and the fraud consequent thereon, being fully established, *Decreed* by the court of chancery, that the defendant, (claiming under such certificate and the grant thereon,) should convey to the complainant all that part of the land held by the defendant under such grant, and which is comprehended in the lines of the tract of land granted to the complainant.

*Trouting Streams,* there is no call for "the beginning trees of *Petticoat's Loose,*" but that the certificate returned to the land office by *Singery,* has this expression, which the relator expressly states was forged and inserted by *Singery* for the purpose of extending the twelfth line of the tract, and thereby taking in more land than he was entitled to. That by the certificate, as made out by *Calder* before mentioned, *Singery's Trouting Streams* is made to contain 178 acres, but that by the certificate returned to the land office by *Singery,* that tract, by virtue of the call above mentioned, contains 560 acres, as *Singery* contends, though the certificate expresses only 178 acres, as will appear by a plot of the land exhibited, and which was made out and returned by the surveyor of *Baltimore* county to the general court, in an action of ejectment therein depending for the land between the relator's lessee and *Singery.* That *Singery,* on the 20th of April 1775, obtained a patent on the said forged certificate, and thereby got 382 acres of land more than he was entitled to, or compounded for with the Proprietary, or his agents. That by virtue of two special warrants obtained from the land office in the year 1793, the relator had surveyed for him, by the surveyor of *Baltimore* county, 300 acres of land, called *Boreing's Habitation Rock,* and returned a certificate thereof, and that afterwards, on the 24th of April 1795, a patent issued to him for the same. That the land taken up, and paid for by him, called *Boreing's Habitation Rock,* is claimed by *Singery* under the false and forged certificate and patent thereon, as will fully appear by the plot before referred to; and that *Singery* has possession of the land, and holds it as being within the lines of *Singery's Trouting Streams.* But the relator expressly charges, that he has instituted an ejectment in the general court against *Singery* to recover the land, and obtained a verdict and judgment in his favour, from which decision *Singery* has appealed to the court of appeals(*a*); and he is apprehensive that the said impositions and forgery will be productive of endless controversies and disputes between him and *Singery,* unless it can be corrected by this court. That by the plot returned to the land office, with the certificate on which the patent issued, it is obvious that *Singery's Trouting Streams,* (which included two old surveys, namely *Petticoat's Loose* and

*(a.)* Vide 4 *Harr. & M'Hen.* 398.

1809

Singery
vs
Attorney-General.

*Merryman's Mountain* and a very small piece of vacancy,) could not contain more than 178 acres, as mentioned in the certificate, because by the plot it appears that *Petticoat's Loose*, and *Merryman's Mountain*, were almost contiguous and adjoining tracts, and there was only a small vacancy between them; but by extending the twelfth line of *Singery's Trouting Streams* to the surreptitious "beginning trees of *Petticoat's Loose*," as now contended for by *Singery*, there will be created a vacancy of 382 acres between the two tracts, which the relator contends is not the fact, but that it is an imposition in *Singery*. That at the time *Singery's Trouting Streams* was surveyed, there was a rule or law of the land office prohibiting the surveyors from expressing calls in any certificates of surveys made by them under any warrant from that office; and that the call in the certificate of *Singery's Trouting Streams*, is in direct violation of that rule; as will appear by recurring to the rules of the land office, and by the deposition of *Calder*, the surveyor, now filed. *Prayer*, that the certificate and patent of *Singery's Trouting Streams* may be vacated, or corrected, so as to exclude the call, and restrict *Singery* to the courses and distances specified in the certificate, and for further relief, &c. The *answer* of *Singery*, the defendant, states that commissioners were appointed by the Lord Proprietary to make sale of his reserved lands, or of parts thereof, and the defendant being in possession of two surveys within the reserves of *Baltimore* county, the one called *Merryman's Mountain*, and the other called *Petticoat's Loose*, purchased the same of the commissioners, and he believes the two parcels of land were reduced into one entire tract under the authority of *Calder*, but not by him, for the defendant states that his survey and certificate were made out by a deputy of *Calder*, who usually made the surveys in the reserves of *Baltimore*. That his object in the purchase and survey was to join his two tracts; and a survey he admits was made called *Singery's Trouting Streams*, and returned to the office, on which patent afterwards issued to the defendant. That he does not know, nor was he ever privy, to any fraud or deception in making the survey or certificate of that land; nor does he know, admit or believe, there was any. He admits the call in the certificate greatly increases the quantity of his land, but he states the call was essentially ne-

cessary to join his two tracts together, which was the ob-
ject of his purchase, and if the surveyor mistook the length
of line, or quantity of acres, it was not with the consent,
knowledge or privity, of the defendant. He does not be-
lieve the certificate recorded in *Calder's* book to be a true
copy of his certificate; and that *Calder* is grossly mistaken
in two important facts, and those facts are misconceived
and mistaken in the bill of complaint. That *Calder* never
did make out or sign a certificate of *Singery's Trouting
Streams* for the office, but that the same was made out,
signed and returned, by the deputy, and is now in the of-
fice, and it was usual and customary for *Calder's* deputy
so to do with his assent, as will appear by a great number
of original certificates in the land office, made out at the
very period when the defendant's was, and some of them on
surveys made in the reserves. That the certificate return-
ed to the office is the true and genuine certificate of
*Singery's Trouting Streams,* which was made out for,
and delivered to him as such, by *Calder* in person, to whom
the defendant carried it, and the same has a call to the
beginning trees of *Petticoat's Loose,* which was a well
known place, and intended to be run to and called for;
and the defendant can prove, that on the original
survey made, the beginning trees of *Petticoat's Loose* were
actually run to, and he offered such evidence on the trial
of the ejectment cause referred to by the bill of complaint,
which testimony the general court refused to admit. The
defendant does not pretend to know what may have been
the rules of the land office at that time as to the calls, but
*Calder* is mistaken in his deposition filed, because there
are many certificates in the office made out and signed by
him, of surveys at that time of reserve lands similar to the
defendants, in which *Calder* hath inserted calls. The de-
fendant denies all fraud, combination, &c. That the call
in his certificate and patent were of such notoriety, and
his possession of, and the beginning trees of *Petticoat's
Loose* were so well known to the neighbourhood, and to
the surveyors in the county, that younger surveys were
made, which called for and run with the line and to the
call mentioned in the defendant's patent, as is demon-
strated by the location of the tract of land called *Horatio's
Lot,* on the plot filed. That the defendant, actuated by
the most honest principles, made a resurvey on his land in

1792, and included the whole of his lands, and returned a certificate to the office, and the excess of the number of acres was called surplus; that he was willing to pay for it, and made his resurvey with that intent, but by reason of the act of 1785, *ch.* 81, the treasurer could not receive such payment, and it was not until after this transaction that the relator, combining and leaguing with *Calder,* who to cover his own negligence and malconduct in office, combined with the relator to cheat the defendant out of his land, and recommended the relator to take up the surplus as vacancy, which *Calder* was to support, by throwing all blame on his deputy, although the records of the land office falsify the oath of *Calder* in two essential facts; first, they show that it was customary for his deputies to make out certificates and sign his name; and secondly, that he himself, in certificates made out and signed by him, did give calls. He admits the action of ejectment instituted in the general court by the lessee of the relator, for recovery of part of the defendant's land, included in the relator's tract called *Boreing's Habitation Rock,* but the facts never came to issue; that the case was determined on a point of law, to which a bill of exceptions was taken, and the judgment of the court was appealed from, and the appeal will go up to the court of appeals in June next. He does not believe the relator is entitled in any court of law or equity to a vacation of the defendant's original grant, the same can only originate in a desire to ruin and oppress the defendant; because if the relator ultimately succeeds in the court of appeals, a decree to convey all the defendant's right and title to the relator, in fee, of all the land contained in his patent of *Boreing's Habitation Rock,* will be sufficient. He further states, that he claims the whole of the land included in his patent called *Singery's Trouting Streams;* that the call was an honest one; that the tracts of land called *Merryman's Mountain* and *Petticoat's Loose,* never did lay contiguous or close to each other, but always lay, were located and held, as by the table of courses thereof on the plot filed; that the survey was made by a deputy of *Calder* named *James Hall,* who made out the certificate, as was common with *Calder's* deputies in the reserves, and that *Calder* did not himself make the same out; and the defendant believes the mistake exists on *Calder's* books; that the entry was made therein from the deputy's field notes,

1809.

Singery
vs
Attorney-General

and the call omitted to be inserted; that the call did exist in the original, and was actually *bona fide* run to at the time of the survey; and the defendant ought not to lose his land from the fraud, negligence or mistake, of *Calder* and his deputies.

The *testimony* of a number of witnesses was taken under commissions and returned. The defendant afterwards by his petition, (referring to the proceedings herein set forth, and to the action of ejectment depending between the parties,) stated that the judgment of the general court in that action had been reversed in the court of appeals, and the record returned to the general court, with a *procedendo* directing a new trial. That since this cause has been set down for hearing in this court, the action of ejectment remanded to the general court for a new trial, has been tried, and a verdict rendered in favour of the defendant. *(ante, 455.)* That on that trial, the general court gave a direction to the jury, that if the certificate of *Singery's Trouting Streams* was forged, that the patent thereon issued was void, or an opinion to that effect. But on a full and fair trial before the jury, a verdict was rendered in favour of the defendant, by which the fairness of the certificate, and validity of the patent was ascertained. That inasmuch as these facts have happened since this cause has been set down for hearing in this court, he is apprehensive that he will not be able to avail himself thereof, without the order of this court. *Prayer* for liberty to exhibit as proof the record of the proceedings in the ejectment, and that the same may be taken as part of the proceedings in this cause.

HANSON, Chancellor, (December 6, 1805.) The chancellor has considered the petition of the defendant. It appears to him convenient to both parties in this cause to grant the prayer of the petition, instead of having proceedings, which would have the same effect as is proposed by the petition, and would be attended with delay and expense. It is therefore ordered, that the prayer be granted; and that the record of the proceedings in the ejectment, stated in the petition, be filed in this cause, and taken as part of the proceedings therein.

The record was accordingly filed; and the case was argued, and submitted to the chancellor for his decision.

KILTY, Chancellor, (July term, 1806,) The object of the bill is, that the certificate and patent of *Singery's Trouting Streams*, therein mentioned to have been fraudulently obtained, may be vacated and annulled, or corrected in the manner stated.

It was filed on the 19th of November 1799, at which time as the bill states, *Boreing* had obtained a verdict and judgment in his favour in an ejectment for the land, from which *Singery* had appealed.

On the 15th of November 1805, a petition was presented to the late chancellor by *Singery*, stating the verdict and appeal, and also stating that the judgment had been reversed, and that on the suit being again tried, a verdict was rendered in his favour, and praying that the record of the proceedings in the ejectment might be taken as part of the proceedings in this cause; which prayer was granted, as appears by the order of December 6th, 1805.

The proceedings have accordingly been filed, and from their connexion with the other testimony, the chancellor has felt considerable difficulty in forming his opinion.

He was at first persuaded that this verdict was either conclusive as to the question of fraud, or of such weight as to prevent his drawing a different conclusion from the whole of the evidence. The authorities on this subject are not very clear. The case most in favour of this position, is *Underwood vs. Morduant*, 2 *Vernon*, 238, in which the court declared, that the question was, whether an assignment was fraudulent or not; and that having been tried at law there was no room for equity to interfere; that if they should relieve the plaintiff, they must declare *that* not to be fraudulent in equity which was found to be so at law.

But on farther consideration he has changed his opinion, on the following grounds: That the suit in this case referred to, having been an ejectment, the verdict is not final between the parties, but another ejectment may be brought. On such further suit the verdict may be given in evidence as the opinion of twelve men on the fact, but it cannot be conclusive, as that would be to defeat the object of the suit. And if in a court of law the question of fraud may be again examined, it cannot be closed against a court of equity, in which fraud is the great subject of relief.

It must be admitted also, that the record, which is thus made part of the proceedings, cannot have a greater effect in bar to this suit, than if it had been used as a plea.

A decree determining the rights of the parties might be pleaded to this bill, and so might a judgment of a court of law, but it must be a judgment which has finally determined the rights of the parties.

The chancellor, considering himself thus empowered to inquire into the fraud alleged in the bill, is satisfied from the evidence, (notwithstanding the verdict showing the opinion of the jury to the contrary,) that the charge is established, and that the complainant is entitled to relief.

In addition to the particular object of the bill, as herein before stated, there is a prayer for general relief, and *Boreing*, at whose relation the bill is filed, is satisfied that *Singery's* patent should remain valid for such part of the land as is not included in the patent for *Boreing's Habitation Rock*; and it appears that for so much the public has been paid by *Singery*. It is therefore considered proper in this case, and conformable to the practice in similar cases, to decree a conveyance from *Singery* of the part claimed by *Boreing*, instead of vacating the patent to *Singery*, as prayed. *Decreed*, that *Singery* do, by a good and sufficient deed, &c. give, grant, &c. to *Boreing*, and his heirs, all that part of the land in *Baltimore* county, now held by him under his patent for a tract of land called *Singery's Trouting Streams*, which is comprehended in the lines of a tract of land called *Boreing's Habitation Rock*, which was granted by this state to *Ezekiel Boreing* on the 24th of April 1795, beginning, &c. with all and singular the appurtenances, &c. and all the right, title and interest, of *Singery*, therein and thereto. And upon the due execution and acknowledgment and recording of the deed, *Boreing* shall be entitled to hold the same free, clear and discharged, from all claim of the defendant. And that the defendant pay to the complainant the costs of this suit, &c. From this decree the defendant appealed to this court.

The cause was argued before Chase, Ch. J. Gantt, and Earle, J.

*Shaaff*, and *Johnson*, *(Attorney-General,)* for the Appellant, cited *Underwood vs. Morduant*, 2 *Vern.* 238. *Bright vs. Eynon.* 1 *Burr.* 376. *Fermor's* case, 3 *Coke*, 78. 1 *Fonbl.* 13, (notes.) *Moses vs. Macferlan*, 2 *Burr.* 1009; and *Negro James vs. Gaither*, (ante 176.)

1809.

Singery
vs
Attorney-General

*Martin* and *T. Buchanan*, for the Appellee, cited *Gains-borough vs. Gifford,* 2 *P. Wms.* 425. *Kent vs. Bridgman, Pre. in Chan.* 233. *Faulconberg vs. Pierce, Ambl.* 210. *Stace vs. Mabbott,* 2 *Ves.* 552. *Matthews vs. Warner,* 4 *Ves.* 206. *The Proprietary vs. Jennings,* 1 *Harr. & M'Hen.* 92. *Russell & Lux vs. Falls,* 3 *Harr. & M'Hen.* 457. *The State vs. Reed,* 4 *Harr. & M'Hen.* 6; and *Garretson vs. Cole,* 1 *Harr. & Johns.* 370.

CHASE, Ch. J. delivered the opinion of the court. In the ejectment brought by the lessee of *Boreing,* for *Boreing's Habitation Rock,* against *Singery,* the question in issue between the parties, on the different locations on the plots, was, who was entitled to that part of *Boreing's Habitation Rock* which was covered by or included within *Singery's Trouting Streams?* This question might have been decided on the different certificates and grants of the parties, and such evidence as might have ascertained what was the true location of the respective tracts claimed by the litigating parties. It appears by the record and testimony in this case, that the certificate and grant of *Singery's Trouting Streams* are older than the certificate and grant of *Boreing's Habitation Rock,* and would have a preference, so far as the conflicting grants interfered.

To repel the defendant's defence, and to impeach his title, the plaintiff offered to prove, that the certificate of *Singery's Trouting Streams* was forged, and the evidence for that purpose was admitted by the court; and such evidence could not have been deemed admissible by the court, only on the ground that if it was proved to be forged, the grant obtained on it was fraudulent, and could not have any operation in law to pass the land to the defendant. That decision must rest on the principle, that what commences in iniquity must transmit its impure or deleterious quality to the grant which was intended to perfect or complete the title of the party, and will invalidate it, unless the Proprietary was apprised of the mal-practice before the issuing the grant. The evidence in a court of law, and in a court of equity, to impeach them, is the same, parol evidence being admissible in both—the effect and final result is the same. In chancery the patent is vacated, and the judgment and decree are declared to be nullities, and the party is enjoined from proceeding further on

them. In a court of law, the judgment is that they can-
not and do not transfer or pass any right or interest. In a
court of law, the mode of examination is preferable, be-
cause the evidence is better sifted, and more critically in-
quired into, and the credit of the witnesses is better test-
ed. Where frauds are clearly established, the courts of
law and a court of chancery have concurrent jurisdiction.
In some cases it may be necessary to resort to a court of
chancery to compel a discovery of facts and circumstances,
which are confined to the knowledge of the parties, in or-
der to prove a fraud; which, it is believed, is the only rea-
son why the applications are more frequent, in cases of
fraud, to the court of chancery, than to a court of law. If
the evidence was improperly admitted because the opera-
tion of a grant cannot be questioned in a court of law for
fraud in obtaining it, then the verdict of the jury, finding
for the defendant, cannot conclude the plaintiff as to the
fact whether the certificate was forged or not. But what
principle is it which allows a court of law to be competent
to inquire into fraud and collusion in obtaining a judgment
or decree, and to declare such judgment or decree inope-
rative to pass any right or interest, which does not extend
to a patent? A judgment or decree must stand on as high
authority as a patent. In this case the fact of forgery came
before the court and jury collaterally, and was not direct-
ly in question, the issue between the parties being, who
had the right of possession to the land in controversy?
and therefore the verdict cannot be received as evidence to
prove that the certificate was not forged. It may very
well be questioned, as the court were not called on, and
did not direct the jury if they found the certificate forg-
ed, that nothing passed by the patent; and as the jury might
suppose, notwithstanding the certificate was forged, that
the prior grant ought to prevail, and could not be affected
by it, whether the verdict could conclude the plaintiff if
the fact of forgery had been directly in issue.

Although on a bill in chancery charging forgery, the de-
fendant cannot be compelled to answer any fact which will
criminate himself, yet the court of chancery has jurisdic-
tion over the case; and on proof of the forgery, by which
a fraud has been committed, will grant relief by vacating
the grant or deed from whence the injury has arisen, or

1809

Singery
vs
Attorney-General

The court are of opinion, that the forgery of the certificate of *Singery's Trouting Streams*, and the fraud consequent thereon, have been fully established, and affirm the decree of the court of chancery, with costs to the appellee.

GANTT, J. dissented.

DECREE AFFIRMED.